# **EXHIBIT A**

Matthew S. Rogers (New Jersey Attorney ID No. 011941980)
msr@mrogerslaw.com
**Law Offices of Matthew S. Rogers, L.L.C.**
123 Prospect Street
Ridgewood, NJ 07450
Tel: (201) 857-3700
Fax: (201) 857-3699

Victor M. Sher *(pending admission pro hac vice)*
vic@sheredling.com
Matthew K. Edling *(pending admission pro hac vice)*
matt@sheredling.com
Katie H. Jones *(pending admission pro hac vice*)
katie@sheredling.com
Timothy R. Sloane *(pending admission pro hac vice)*
tim@sheredling.com
**SHER EDLING LLP**
100 Montgomery St., Suite 1410
San Francisco, CA 94104
Tel:    (628) 231-2500
Fax:    (628) 231-2929

*Attorneys for Plaintiff Ridgewood Water*

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
BERGEN COUNTY
DOCKET NO.: _____

**RIDGEWOOD WATER**

Plaintiff,

v.

**3M COMPANY, E.I. DU PONT DE NEMOURS & COMPANY, THE CHEMOURS COMPANY, HONEYWELL INTERNATIONAL INC., TYCO FIRE PRODUCTS LP, CHEMGUARD INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., AND DOES 1-50, INCLUSIVE.**

Defendants.

Civil Action

COMPLAINT

Jury Trial Demand

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................ 1

II.   Parties ............................................................................................................... 2

III.  Venue ................................................................................................................ 6

IV.   Factual Allegations ......................................................................................... 6

      A.   PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory
           Standards ................................................................................................. 6

      B.   Defendants' Production of PFOA and PFOS Products ................................ 8

      C.   Defendants' Production and Commercialization of AFFF ........................... 9

      D.   Defendants' Knowledge of Threats Posed by Their PFOA and PFOS Products ....... 10

      E.   Major Sources of PFOA and PFOS in the Environment ........................... 14

      F.   Ridgewood Is Injured ............................................................................. 16

      G.   Treatment of PFOA and PFOS ............................................................... 17

V.    Causes of Action ............................................................................................ 17

      FIRST CAUSE OF ACTION
      Strict Products Liability for Defective Design ................................................. 17

      SECOND CAUSE OF ACTION
      Strict Products Liability for Failure to Warn ................................................. 21

      THIRD CAUSE OF ACTION
      Negligence ....................................................................................................... 24

      FOURTH CAUSE OF ACTION
      Trespass ........................................................................................................... 28

VI.   Designation of Trial Counsel ......................................................................... 30

VII.  Certification Pursuant to Rule 4:5-1 ............................................................. 30

VIII. Demand for Jury Trial .................................................................................... 31

i

Plaintiff Ridgewood Water ("Ridgewood"), a public drinking water provider having its principal office at 131 North Maple Avenue, in the Village of Ridgewood in the County of Bergen, State of New Jersey, by and through its attorneys, files this Complaint against the above-named defendants and alleges as follows:

## I.     Introduction

1.      Ridgewood brings this action to recover the substantial costs necessary to protect the public and restore its damaged drinking water supply wells from exposure to and contamination with toxic per- and poly-fluroalkyl substances ("PFAS"), including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"), from Defendants' products.[1]

2.      Defendants 3M Company, the E.I. DuPont de Nemours and Company, The Chemours Company, Honeywell International Inc., Tyco Fire Products LP (successor-in-interest to Ansul Co.), Chemguard Inc., Buckeye Fire Equipment Company, National Foam, Inc. (collectively, "Defendants"), manufactured, marketed, sold, and/or promoted PFOA, PFOS, products containing PFOA and/or PFOS, and/or products that degrade to PFOA and/or PFOS upon release to the environment, including but not limited to fluoropolymers and aqueous film-forming foam ("AFFF"), a firefighting product used on flammable liquid fires.

3.      PFOA and PFOS are toxic, not easily biodegradable, persistent in the environment, and pose a significant risk to human health and safety. PFOA and PFOS are associated with a variety of illnesses, including cancer, and considered particularly dangerous to pregnant women and young children.

4.      Defendants knew or should have known that PFOA and PFOS are highly soluble

---

[1] Ridgewood reserves its right to bring additional claims should it incur injuries attributable to the presence of other PFAS in its wells.

1

in water; extremely mobile; persistent; very likely to contaminate surface and groundwater, including drinking supplies; and present significant risks to human health and welfare if released to the environment.

5.      Nonetheless, Defendants manufactured, marketed, sold, and/or promoted PFOA and/or PFOS; products containing PFOA and/or PFOS; and/or products that products that would degrade to PFOA and/or PFOS upon release to the environment to industrial facilities and consumers in New Jersey, with the knowledge that those compounds would be discharged to the land and water in New Jersey as a waste product of certain industrial manufacturing processes, during normal use and disposal of such products, and/or during firefighting training and rescue exercises and in firefighting emergencies, among other normal and foreseeable uses.

6.      Ridgewood files this lawsuit to recover compensatory damages and all other available remedies, including, but not limited to, all necessary funds to reimburse Ridgewood for the costs of designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA and PFOS from its drinking water wells, and all associated costs and damages, and to ensure that the parties responsible for the drinking water contamination bear these expenses, rather than Ridgewood and its ratepayers.

II.     **Parties**

7.      **Plaintiff Ridgewood Water** is a public drinking water provider that serves approximately 61,700 customers in Bergen County, New Jersey. Ridgewood's service area spans four municipalities: the Boroughs of Glen Rock and Midland Park, the Township of Wyckoff, and the Village of Ridgewood.

8.      Ridgewood operates 52 municipal supply wells distributed throughout its service area. Ridgewood also obtains a portion of its water via interconnections with other water utilities, including Suez Water New Jersey and Hawthorne Water Department.

9.      Forty-four of Ridgewood's fifty-two wells are already contaminated with PFOA and PFOS. PFOA and PFOS are spreading throughout the aquifer system from which Ridgewood draws its drinking water supply, further threatening Ridgewood's already-contaminated wells, untested but potentially contaminated wells, and as-yet uncontaminated wells.

10.     **Defendant 3M Company** ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M does business throughout the United States, including in New Jersey. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold PFAS, including PFOA and PFOS, for use in its own and other products manufactured throughout the country, including in New Jersey; and AFFF containing PFOA and/or PFOS used to fight fires in New Jersey.

11.     **Defendant E.I. du Pont de Nemours & Company** ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont does business throughout the United States, including in New Jersey. DuPont marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFOA, PFOS, products containing PFOA and/or PFOS, and/or products that would degrade to PFOA and/or PFOS upon release to the environment throughout the country, including in New Jersey. DuPont has operated facilities in New Jersey that manufacture PFOA, PFOS, and/or PFAS-related products, and that are known to have caused PFOA and PFOS contamination to surrounding groundwater aquifers.

12.     **Defendant The Chemours Company** ("Chemours") is a Delaware corporation

3

with its principal place of business in Wilmington, Delaware. In 2015, DuPont spun off its "performance chemicals" businesses, including its fluoroproduct business, to Chemours. Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business. Additionally, DuPont and Chemours have agreed to share liabilities for claims arising from PFOA contamination arising from at least some of DuPont's former manufacturing sites.

13.    **Defendant Honeywell International Inc.** ("Honeywell") is a Delaware corporation with its principal place of business in Morris Plains, New Jersey. Honeywell is a successor -in-interest to Allied Chemical Corporation ("Allied"). Allied, and Honeywell in its own right, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFOA, PFOS, products containing PFOA and/or PFOS, and/or products that would degrade to PFOA and/or PFOS upon release to the environment throughout the country, including in New Jersey. Allied, and Honeywell in its own right, have operated multiple facilities in New Jersey at which products that contain or degrade to PFOA and/or PFOS were manufactured. Such products were then sold to third parties, including in New Jersey.

14.    **Defendant Tyco Fire Products, LP** ("Tyco") is a Delaware limited partnership, with its principal place of business in Lansdale, PA. Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul"), a corporation organized under the laws of Wisconsin (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). At all times relevant, Tyco/Ansul manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other fluorinated products that contained or degrade to PFOA and/or PFOS, including

4

in New Jersey.

15.     **Defendant Chemguard Inc.** ("Chemguard") is a Wisconsin corporation with its principal place of business in Marinette, Wisconsin. At all times relevant, Chemguard manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other fluorinated products that contain or degrade to PFOA and/or PFOS, including in New Jersey.

16.     **Defendant Buckeye Fire Equipment Company** ("Buckeye Fire") is a North Carolina corporation with its principal place of business in Mountain, North Carolina. At all times relevant, Buckeye Fire manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other fluorinated products that contain or degrade to PFOA and/or PFOS, including in New Jersey.

17.     **Defendant National Foam, Inc.**, also known as Chubb National Foam (collectively "National Foam"), is a Delaware corporation with its principal place of business in West Chester, Pennsylvania. National Foam manufactures the Angus brand of products and is successor-in-interest to Angus Fire Armour Corporation, a corporation organized under the laws of Delaware. At all times relevant, National Foam manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other fluorinated products that contain or degrade to PFOA and/or PFOS, including in New Jersey.

18.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

19.     All references to a Defendant or Defendants in this Complaint include any

5

predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

20.    **Doe Defendants**: Except as described herein, Ridgewood is ignorant of the true names of Defendants sued as Does 1 through 50, inclusive, and, therefore, Ridgewood sues these defendants by fictitious names. Following further investigation and discovery, Ridgewood will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained. Ridgewood is informed and believes, and on that basis alleges, that each of these fictitiously named Defendants is a manufacturer, supplier, promoter, distributor, and/or seller of PFOA, PFOS, products containing PFOA and/or PFOS, and/or products that would degrade to PFOA and/or PFOS upon release to the environment, and is responsible in some manner for the acts alleged herein.

21.    These fictitiously named Defendants aided and abetted and/or conspired with the named Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## III.    Venue

22.    Venue is proper in Bergen County, New Jersey, Superior Court under R. 4:3-2(a) because Ridgewood's causes of action arose in Bergen County and because Ridgewood's principal place of business is in Bergen County.

## IV.    Factual Allegations

### A.    PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory Standards

23.    PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. The PFAS family of chemicals

6

is entirely manmade and does not occur in nature. PFOA and PFOS are among the most toxic chemicals in the PFAS family.

24.     PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they are soluble and do not adsorb (stick) to soil particles, and they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

25.     PFOA and PFOS bioaccumulate and biomagnify in people and other organisms.

26.     Scientists link PFOA and PFOS with a wide range of serious public health impacts.

27.     PFOA and PFOS contamination presents a serious threat to public health through drinking water.

28.     PFOA and PFOS enter the environment from industrial facilities that manufacture PFOA or PFOS, or that use PFOA, PFOS, or products that degrade to PFOA or PFOS in the manufacture or production of other products (collectively, "PFOA and PFOS Products"). Releases to land and water from a multitude of industrial sites are known pathways to the environment. PFOA and PFOS may also enter the environment when released from PFOA- or PFOS-containing consumer and commercial products during their use and disposal.

29.     In October 2017, the New Jersey Department of Environmental Protection ("DEP") announced that it would accept the Drinking Water Quality Institute's recommendation of a health-based maximum contaminant level ("MCL") of 14 parts per trillion ("ppt") for PFOA. In August

2018, DEP accepted the Institute's recommendation for an MCL of 13 ppt for PFOS. The State of New Jersey also established in September 2018 an MCL of 13 ppt for perfluorononanoic acid ("PFNA"), a related PFAS. The establishment of the health-based MCLs triggers certain State regulatory requirements governing Ridgewood's wells and operations; in some circumstances action is required even if current levels contamination levels are below the MCL to protect against MCL exceedances. Such State requirements include, but are not limited to, required investigatory and remedial action by public water suppliers to protect public health, including by taking action to remove PFAS contamination from water in its wells.

### B.    Defendants' Production of PFOA and PFOS Products

30.    PFAS were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

31.    For most of the past several decades, 3M has been the primary manufacturer of PFOA and PFOS.

32.    3M began producing PFOA and PFOS as raw materials that they used to produce other products, or that they sold to third parties for use in other products. 3M produced PFOA and PFOS by electrochemical fluorination in the 1940s. This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS. 3M went on to market several PFOA and PFOS Products, including AFFF, its Scotchguard brand of stain repellant, food packaging, textile treatments, flurosurfactants and additives, and others. 3M ceased PFOA production in 2002 under pressure from the U.S. EPA.

33.    DuPont began production for sale of polytetrafluoroethylene ("PTFE") in or around 1951. The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. DuPont marketed its PTFE under the trade name "Teflon." PTFE

8

is a fluoropolymer (i.e. a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water or oil; a lubricant; a coating for catheters and other medical equipment; an oxidizer in flares; in dental fillings; and many others. DuPont has produced and produces numerous other PFOA and PFOS Products. DuPont also began producing PFOA as a raw material for its own use and for sale in or around 2002, after 3M ceased PFOA production.

34.     Honeywell began producing fluoropolymers in New Jersey in or around 1963, eventually building a plant that produced 3 million pounds of PTFE annually. Honeywell has produced other PFOA and PFOS Products, including organic pigments, other fluropolymer dispersions, and fluropolymer resins. Honeywell marketed its PFOA and PFOS Products to other industrial users, including for use in the computer industry; in manufacturing valves, fittings, and other connections; as ball bearings or sliding parts; and other applications.

### C.     Defendants' Production and Commercialization of AFFF

35.     AFFFs are synthetically formed by combining fluorine-free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, a solution forms producing aqueous film that spreads across the surface of a hydrocarbon fuel. This film formation feature is what provides the fire extinguishment.

36.     In the 1960s, 3M began developing firefighting foams containing PFOA to suppress flammable liquid fires. In the early 1970s, 3M began producing solely PFOS-based AFFF.

37.     Tyco, Chemguard, Buckeye, and National Foam entered the AFFF business at various times since the early 1970s. These Defendants used a process called telomerization to produce the fluorinated surfactants contained in their firefighting foams. Telomer-based foams do not contain or degrade into PFOS, and are not made with PFOA, but may contain those compounds

as impurities from the manufacturing process. These telomer-based foams contain other PFAS, and are therefore distinguishable from 3M-produced AFFF.

38.     After its creation in the 1960s AFFF was widely used across the country.

39.     AFFF users have long conducted exercises, including firefighting and explosion training, where AFFF was sprayed directly on the ground, as Defendants instructed, which allowed PFAS to travel to surrounding surface water, sediment, and groundwater.

40.     Some federal and/or federally-regulated facilities purchased AFFF manufactured to military specifications, known as "Milspec." AFFF Mil-Spec sets out only performance specifications, not manufacturing or production specifications. While Mil-Spec calls for a "fluorinated surfactant," there are thousands of such compounds.

41.     Milspec specifications do not govern or apply to the general formulation and sale of AFFF sold for commercial use. As such, Milspec did not and does not apply to any commercial transactions involving AFFF that do not involve either the military or a federally-regulated airport.

**D.     Defendants' Knowledge of Threats Posed by Their PFOA and PFOS Products**

42.     For more than 50 years, Defendants were or should have been aware of the dangers to people of environmental exposure to their PFOA and PFOS products (including via drinking water); and that the production and use of PFOA and PFOS Products resulted in the release of PFOA and PFOS to the environment. Despite this knowledge, Defendants failed to adequately investigate and test their products to ensure they would not cause harm to the public; and continued their PFOA and PFOS production and marketing practices without eliminating the defects in their products, and without warning of the known dangers of their products. These measures could have eliminated or reduced damage and injuries to Ridgewood's drinking water production wells.

43.     By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in

10

bioaccumulation of those compounds in the human body.

44.    3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

45.    DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

46.    As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

47.    By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

48.    By at least 1970, 3M was aware that its PFAS products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

49.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that their products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

50.     As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS' health effects.

51.     Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. DuPont was aware of 3M's findings no later than 1981.

52.     Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to C8, DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

53.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

54.     According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, that resistance had not ceased.

55.     In 1981, DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

56.     In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

12

57.     DuPont was long aware it was releasing from its facilities PFAS that were leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont in 1984 held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. DuPont chose not to use either, despite knowing of PFOA's toxicity.

58.     During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use in 3M's business, and had "no incentive to take any other position."

59.     In 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

60.     By at least 1993, Defendants were aware that PFAS were linked to increased cancer rates in humans exposed to their PFOA products. 3M memos show that in 1993, it worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

61.     Despite its understanding of the hazards associated with its PFOA and PFOS Products, 3M actively sought to suppress scientific research on the hazards associated those

products, and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health and ecological risks of its PFOA and PFOS Products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFCs] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

62.     In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

63.     All Defendants knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment. This knowledge was accessible to all Defendants.

E.     **Major Sources of PFOA and PFOS in the Environment**

64.     Manufacturing facilities where Defendants' PFOA and PFOS Products are synthesized and made into products or chemical feedstocks, or where PFOA and PFOS are used as processing aids, as well as secondary manufacturing facilities where PFOA and PFOS Products such as PTFE are applied to other products, are major PFOA and PFOS release sites. Industries that are known sources of PFOA and PFOS releases to the environment include textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, manufacturers and

facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. PFAS releases at industrial sites are generally due to direct wastewater discharge, as well as accidental releases such as leaks or spills.

65.     There are several current and former industrial sites near Ridgewood's wells or located in the vicinity of sources of Ridgewood's water supply that are likely to have contributed to the release of PFOA and PFOS from Defendants' PFOA and PFOS Products, and consequent contamination of Ridgewood's wells. Such sites include, but are not limited to, the Saint-Gobain Performance Plastics facility in Wayne, the former International Wire Products Company site in Wyckoff, the former George Glove Company site in Midland Park, the Tam Metal Products site in Mahwah, and stone cutting businesses in Ridgewood Junction.

66.     Fire suppression and fire-fighting training activities are sources of PFAS releases to the environment, via the discharge of AFFF. For decades, Defendants did not warn AFFF users of PFOA and PFOS's existence in AFFF, the hazards associated with PFOA and PFOS in AFFF, or the mobility and persistence of PFOA and PFOS released to the environment when AFFF was used as instructed by Defendants by spraying it directly on the ground during fire training exercises. The use of AFFF to extinguish fires allowed PFOA and PFOS to escape into the ground and migrate to surrounding public and private drinking water wells. As such, sites where AFFF was used, including fire training areas, sites of past emergency response incidents, airports, and other areas where AFFF has been stored and accidentally released, are substantial contributors to PFOA and PFOS contamination. Throughout the time AFFF containing PFOA and PFOS have been used, the instructions, warning labels, and material safety data sheets that were provided with the AFFF by the Defendants did not fully identify and notify customers, users, regulators, public water suppliers, or the public concerning the health and environmental hazards of AFFF, of which

Defendants knew or should have known.

67.    There are several known AFFF release sites near Ridgewood's wells that likely have contributed to the release of Defendants' PFAS and consequent contamination of Ridgewood's wells, including, but not limited to, municipal facilities such as the Bergen County Law and Public Safety Institute in Mahwah and the Ridgewood Fire Department in the Village of Ridgewood; and locations of past fire suppression activities, such as the site of a large fire in 2015 at an electrical substation on Hopper Road near Ho-ho-kus Brook.

68.    Ridgewood has diligently investigated known and potential sources of PFAS contamination in the District's wells and water supply. Ridgewood cannot identify any military or federally-regulated airport as a source of such PFAS contamination, and on that basis alleges that the PFAS contamination in its wells is not from such sources.

69.    There are no U.S. government military sites or federally-regulated facilities that are release sites/sources of contamination of Ridgewood's wells.

**F.    Ridgewood Is Injured.**

70.    PFOA and PFOS have been detected in varying amounts at varying times in nearly all of Ridgewood's wells. A substantial portion of those wells have tested above the proposed MCL for PFOA, and at levels approaching and in some cases exceeding the proposed MCL for PFOS. An additional, substantial portion of Ridgewood's wells exceed levels that are injurious, including because regulatory standards require actions at levels below MCLs. In addition, PFOA and PFOS's high mobility and persistence in soil and groundwater means they will likely continue to spread and affect even more of Ridgewood's wells in the future.

71.    Defendants' PFOA and PFOS products are the major sources of the PFOA and PFOS released to the environment that ultimately reached groundwater that supplies Ridgewood's

production wells. PFOA and PFOS have reached those wells due to the routine, foreseeable, and intended use and disposal of Defendants' PFOA and PFOS products in the vicinity of locations from which Ridgewood obtains water, including its groundwater wells, and source sites for imported water. Such use, disposal, and environmental transport has brought PFOA and PFOS to Ridgewood's wells from releases at a myriad of diffuse sources, including, but not limited to, industrial and manufacturing facilities and businesses; fire suppression and training sites; AFFF storage sites; locations where PFAS-contaminated water is used for irrigation; sites where consumer products are disposed; and others.

72.    To address PFOA and PFOS contamination in its wells, Ridgewood has, *inter alia*, removed from service wells with elevated PFOA and PFOS levels; and incurred expenses in developing plans to address PFOA and PFOS in a subset of its wells, including by planning to add wellhead treatment. Ridgewood anticipates taking these and additional steps to address the continuing and future PFOA and PFOS contamination in its wells attributable to Defendants' tortious conduct.

**G.    Treatment of PFOA and PFOS**

73.    The most viable technologies to remove PFAS compounds from drinking water are granular activated carbon treatment ("GAC"), reverse osmosis, electrochemical oxidation, and anion exchange. Each of these technologies is extremely expensive to build, install, operate and maintain.

**V.    Causes of Action**

**FIRST CAUSE OF ACTION**
**Strict Products Liability for Defective Design**

74.    Ridgewood realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

17

75.     As manufacturers and/or sellers of PFOA and PFOS Products, Defendants had a strict duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses, and owed that duty both to reasonably foreseeable users of those products and to any person who might reasonably be expected to come into contact with those products.

76.     Defendants knew that third parties would purchase PFOA and PFOS Products and use them without inspection for defects.

77.     PFOA and PFOS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or waters. Such discharges occurred at various locations, at various times, and in various amounts. PFOA and PFOS resulting from such discharges moved through the environment and did not degrade, and eventually contaminated Ridgewood's wells.

78.     The PFOA and PFOS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

79.     Defendants knew or reasonably should have known that the use of their PFOA and PFOS Products in an intended or reasonably foreseeable manner would result in the spillage, discharge, disposal, or release of PFOA and PFOS onto land or into water such that PFOA and PFOS foreseeably contaminated Ridgewood's wells.

80.     The PFOA and PFOS Products that are injuring Ridgewood's wells are defective in design and unreasonably dangerous because, among other things:

        a.     PFOA and PFOS cause extensive and persistent contamination when they, or products containing them, are used in a reasonably foreseeable or intended manner.

18

      b.   PFOA and PFOS contamination in groundwater and surface water that are the sources of drinking water poses significant threats to public health and welfare.

      c.   Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFOA and PFOS Products.

81.    At all times relevant to this action, PFOA and PFOS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and the foreseeable risk of harm to public health and welfare via drinking water contamination posed by PFOA and PFOS Products outweighed the cost to Defendants of reducing or eliminating such risk.

82.    Defendants knew or should have known about reasonably safer feasible alternatives to PFOA and PFOS Products, and the omission of such alternative designs rendered Defendants' products not reasonably safe.

83.    As a direct and proximate result of the defects previously described, Ridgewood's wells became contaminated with PFOA and PFOS in varying amounts over time, causing Ridgewood significant injury and damage.

84.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Ridgewood has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

85.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of Ridgewood's wells. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts

or omissions. Such conduct was performed to promote sales of their PFOA and PFOS Products, or to reduce or eliminate expenses Defendants would otherwise have incurred to remove PFOA and PFOS from their waste streams, despite the impacts on Ridgewood's wells and on public health and welfare. Therefore, Ridgewood requests an award of punitive damages for Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Ridgewood requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

86.    Defendants are strictly, jointly, and severally liable for all such damages, and Ridgewood is entitled to recover all such damages and other relief as set forth below.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Defendants, jointly and severally, for

a.    Declaratory judgment that Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in Ridgewood's wells as described herein and to compensate Ridgewood for the lost value and benefits its wells during all times of injury caused by Defendants' PFOA and PFOS Products, and for such orders as may be necessary to provide full relief to address the risks to Ridgewood and its customers;

b.    Compensatory damages for all injuries Ridgewood has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Defendants' PFOA and PFOS Products, and their wrongful marketing and promotion thereof; and for all other injuries sustained by Ridgewood as a direct and proximate result of

20

Defendants' acts and omissions alleged herein, according to proof, including, but not limited to remedial, administrative, oversight, and legal expenses and compensation for damages to Ridgewood's wells;

c.      Punitive damages in an amount to be determined at trial;

d.      Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

e.      Such other relief as this Court deems equitable, just, and appropriate.

## SECOND CAUSE OF ACTION
### Strict Products Liability for Failure to Warn

87.     Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

88.     As manufacturers and/or sellers of PFOA and PFOS Products, Defendants had a strict duty to Ridgewood to warn users of those products of the foreseeable harms associated with those products.

89.     Defendants inadequately warned users and buyers of their PFOA and PFOS Products of the likelihood that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases. To the extent Defendants provided warnings about their products, such warnings did not convey a fair indication of the nature and extent of the hidden dangers of Defendants' products to the mind of a reasonable user, because, among other things, they lacked descriptions of the nature and extent of the contamination of drinking water production wells that resulted from those products. Indeed, despite Defendants' own unique knowledge of such hazards, they elected to withhold such knowledge from Ridgewood, regulators, and the public; to affirmatively distort and/or suppress

21

their knowledge and the scientific evidence linking their products to such hazards; and to instruct users to release their products directly to the ground where PFOA and PFOS therein could infiltrate drinking water supplies.

90.    Defendants failed to warn of the hidden dangers associated with their PFOA and PFOS Products before those products left their control, and at all stages of the chain of commerce; at no time relevant to this Complaint did Defendants warn that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

91.    Defendants' PFOA and PFOS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

92.    PFOA and PFOS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water that are pathways to the groundwater that supplies Ridgewood's drinking water production wells.

93.    Defendants knew or should have known that the use of PFOA and PFOS Products in their intended manners would result in the discharge, disposal, or release of PFOA and PFOS onto land or into water, such that PFOA and PFOS would contaminate drinking water supplies.

94.    The PFOA and PFOS Products used and disposed of in a manner that caused contamination in Ridgewood's wells were defective in design and unreasonably dangerous products for the reasons set forth in Paragraphs 80, 81, and 82, *supra*.

95.    Ridgewood's wells reasonably should have been expected to come into contact with PFOA and PFOS from Defendants' products.

96.    Had Defendants provided adequate warnings about the hazards associated with

their PFOA and PFOS Products, third party users would have heeded that warning.

97.     As a direct and proximate result of Defendants' failure to warn of the hazards of their PFOA and PFOS Products that were, or reasonably should have been, known to them, Ridgewood's wells are contaminated with PFOA and PFOS.

98.     As a direct and proximate result of Defendants' acts and omissions as alleged herein, Ridgewood has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

99.     Defendants knew it was substantially certain that their acts and omissions described herein would cause injury and damage, including PFOA and PFOS contamination of Ridgewood's wells. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFOA and PFOS Products, or to reduce or eliminate expenses Defendants would otherwise have incurred to remove PFOA and/or PFOS from their waste streams, despite the impacts on Ridgewood's wells and on public health and welfare. Therefore, Ridgewood requests an award of punitive damages for Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Ridgewood requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

100.    Defendants are strictly, jointly and severally liable for all such damages, and Ridgewood is entitled to recover all such damages and other relief as set forth below.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Defendants, jointly and severally, for

a.    Declaratory judgment that Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in Ridgewood's wells as described herein and to compensate Ridgewood for the lost value and benefits its wells during all times of injury caused by Defendants' PFOA and PFOS Products, and for such orders as may be necessary to provide full relief to address the risks to Ridgewood and its customers;

b.    Compensatory damages for all injuries Ridgewood has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Defendants' PFOA and PFOS Products, and their wrongful marketing and promotion thereof; and for all other injuries sustained by Ridgewood as a direct and proximate result of Defendants' acts and omissions alleged herein, according to proof, including, but not limited to remedial, administrative, oversight, and legal expenses and compensation for damages to Ridgewood's wells;

c.    Punitive damages in an amount to be determined at trial;

d.    Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

e.    Such other relief as this Court deems equitable, just, and appropriate.

### THIRD CAUSE OF ACTION
### Negligence

101.    Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

102.    As manufacturers of PFOA and PFOS Products, Defendants owed a duty to

24

Ridgewood to warn buyers and users of their PFOA and PFOS Products of the hidden dangers associated with release to the environment of PFOA and PFOS in those products.

103.    Defendants breached this duty by inadequately warning users and buyers of their PFOA and PFOS Products of the likelihood that their products would cause PFOA and PFOS to be released to the environment during their normal, intended and foreseeable use, and of the widespread, toxic, and persistent effects of such releases. To the extent Defendants provided warnings about their products, such warnings did not convey a fair indication of the nature and extent of the hidden dangers of Defendants' products to the mind of a reasonable user, because, among other things, they lacked descriptions of the nature and extent of the contamination of drinking water production wells that resulted from those products. Indeed, despite Defendants own unique knowledge of such hazards, they elected to withhold such knowledge from Ridgewood, regulators, and the public; to affirmatively distort and/or suppress their knowledge and the scientific evidence linking their products to such hazards; and to instruct users to release their products directly to the ground where PFOA and PFOS therein could infiltrate drinking water supplies.

104.    Among other things, Defendants breached this duty when they manufactured, marketed, distributed, supplied, and/or sold PFOA and PFOS Products even though they knew or should have known of the dangers that PFOA and PFOS posed to drinking water supplies. Defendants should have known that the manner in which they were manufacturing, marketing, and selling PFOA and PFOS Products would result in and cause contamination of Ridgewood's wells.

105.    Ridgewood's wells were and are within the area foreseeably exposed to the risk of Defendants' inadequate warnings about their PFOA and PFOS Products. Defendants knew or should have known of the myriad potential industrial and consumer release sites and of the rapid

mobility and persistence of PFOA and PFOS released to the environment, such that all of Ridgewood's wells are susceptible to PFOA and PFOS contamination.

106.    Defendants failed to warn of the hidden dangers associated with their PFOA and PFOS Products before those products left their control, and at all stages of the chain of commerce; at no time relevant to this Complaint did Defendants warn that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

107.    As a direct and proximate result of Defendants' failure to warn of the hazards of their PFOA and PFOS Products in New Jersey that were, or reasonably should have been, known to them, Ridgewood's wells are contaminated with PFOA and PFOS.

108.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Ridgewood has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

109.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of Ridgewood's wells. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFOA and PFOS Products, or to reduce or eliminate expenses Defendants would otherwise have incurred to remove PFOA and PFOS from their waste streams, despite the impacts on Ridgewood's wells and on public health and welfare. Therefore, Ridgewood requests an award of punitive damages for Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Ridgewood requests an award of punitive damages in an amount

26

sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

110.    Defendants are jointly and severally liable for all such damages, and Ridgewood is entitled to recover all such damages and other relief as set forth below.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Defendants, jointly and severally, for

a.    Declaratory judgment that Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in Ridgewood's wells as described herein and to compensate Ridgewood for the lost value and benefits its wells during all times of injury caused by Defendants' PFOA and PFOS Products, and for such orders as may be necessary to provide full relief to address the risks to Ridgewood and its customers;

b.    Compensatory damages for all injuries Ridgewood has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Defendants' PFOA and PFOS Products, and their wrongful marketing and promotion thereof; and for all other injuries sustained by Ridgewood as a direct and proximate result of Defendants' acts and omissions alleged herein, according to proof, including, but not limited to remedial, administrative, oversight, and legal expenses and compensation for damages to Ridgewood's wells;

c.    Punitive damages in an amount to be determined at trial;

BER-L-001447-18   02/25/2019 2:34:44 PM  Pg 30 of 33 Trans ID: LCV2019341628

   d.     Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

   e.     Such other relief as this Court deems equitable, just, and appropriate.

## FOURTH CAUSE OF ACTION
### Trespass

111.   Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

112.   Ridgewood is entitled to exclusive possession of its drinking water production wells.

113.   The presence of PFAS in Ridgewood's wells constitutes a physical invasion of Ridgewood's property without permission or license.

114.   Defendants are jointly and severally liable for trespass, and continued trespass, because Defendants negligently and recklessly caused PFOA and PFOS to be present in Ridgewood's wells as described herein.

115.   As long as Ridgewood's wells remain contaminated with PFOA and PFOS due to Defendants' conduct, the trespass continues.

116.   Ridgewood is harmed by the presence of Defendants' PFOA and PFOS in its wells, including, but not limited to, by being unable to use contaminated wells; and by incurring expenses in planning for, constructing, operating, and maintaining treatment infrastructure at contaminated wells.

117.   Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of Ridgewood's wells. Defendants committed each of the above-described acts and omissions with actual malice

or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFOA and PFOS Products, or to reduce or eliminate expenses Defendants would otherwise have incurred to remove PFOA and PFOS from their waste streams, despite the impacts on Ridgewood's wells and on public health and welfare. Therefore, Ridgewood requests an award of punitive damages for Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Ridgewood requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

118.    Defendants are jointly and severally liable for all such damages, and Ridgewood is entitled to recover all such damages and other relief as set forth below.

**WHEREFORE,** Plaintiff Ridgewood Water prays for judgment against Defendants, jointly and severally, for

a.     Declaratory judgment that Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in Ridgewood's wells as described herein and to compensate Ridgewood for the lost value and benefits its wells during all times of injury caused by Defendants' PFOA and PFOS Products, and for such orders as may be necessary to provide full relief to address the risks to Ridgewood and its customers;

b.     Compensatory damages for all injuries Ridgewood has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Defendants' PFOA and PFOS Products, and their wrongful marketing and promotion thereof; and for

29

all other injuries sustained by Ridgewood as a direct and proximate result of Defendants' acts and omissions alleged herein, according to proof, including, but not limited to remedial, administrative, oversight, and legal expenses and compensation for damages to Ridgewood's wells;

c. Punitive damages in an amount to be determined at trial;

d. Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

e. Such other relief as this Court deems equitable, just, and appropriate.

Dated: February 25, 2019   **Law Offices of Matthew S. Rogers, L.L.C.**

By: _____

Matthew S. Rogers

*Attorneys for Plaintiff Ridgewood Water*

## VI. Designation of Trial Counsel

**PLEASE TAKE NOTICE** that pursuant to the provisions of New Jersey Court Rule 4:25-4, Sher Edling LLP is hereby designated as trial counsel for Ridgewood.

## VII. Certification Pursuant to Rule 4:5-1

I, Matthew S. Rogers, of full age, hereby certify as follows:

1. I am an attorney-at-law a for Plaintiff in the above-captioned matter. I am fully aware of the facts herein.

2. The matter in controversy is neither the subject of any other action pending in any other court nor of a pending arbitration proceeding.

30

3.     It is not anticipated that the matter in controversy will become the subject of any other action pending in any other court or of a pending arbitration proceeding. Similar subject matter is at issue in the federal multi-district litigation styled *In re Aqueous Film-Forming Foams Products Liability Litigation*, No. MDL 2873 (U.S. Jud. Pan. Mult. Lit. Dec. 7, 2018).

4.     All parties who should have been joined in this action have been so joined.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

Dated: February 25, 2019                    **Law Offices of Matthew S. Rogers, L.L.C.**

By:   _____
                                         Matthew S. Rogers

                                         *Attorneys for Plaintiff Ridgewood Water*

## VIII.   Demand for Jury Trial

Pursuant to New Jersey Court Rules 1:8-1(b) and 4:35-1(a), Plaintiff requests a trial by jury of all issues so triable raised in this Complaint.

Dated: February 25, 2019                    **Law Offices of Matthew S. Rogers, L.L.C.**

By:   _____
                                         Matthew S. Rogers

                                         *Attorneys for Plaintiff Ridgewood Water*

BER-L-001447-19    02/25/2019 2:34:44 PM    Pg 1 of 1 Trans ID: LCV2019324623

# Civil Case Information Statement

**Case Details: BERGEN | Civil Part Docket# L-001447-19**

**Case Caption:** RIDGEWOOD WATER   VS THE 3M
COMPANY

**Case Initiation Date:** 02/25/2019

**Attorney Name:** MATTHEW S ROGERS

**Firm Name:** MATTHEW S. ROGERS

**Address:** 123 PROSPECT STREET
RIDGEWOOD NJ 07451

**Phone:**

**Name of Party:** PLAINTIFF : Ridgewood Water

**Name of Defendant's Primary Insurance Company**
**(if known):** Unknown

**Case Type:** ENVIRONMENTAL/ENVIRONMENTAL COVERAGE
LITIGATION

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same**
**transaction or occurrence)?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual**
**management or accelerated disposition:**


**Do you or your client need any disability accommodations?** NO
       **If yes, please identify the requested accommodation:**


**Will an interpreter be needed?** NO
       **If yes, for what language:**


I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/25/2019
Dated

/s/ MATTHEW S ROGERS
Signed

BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK        NJ 07601-7680

                                    TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (201) 221-0700
COURT HOURS  8:30 AM - 4:30 PM

                    DATE:  FEBRUARY 25, 2019
                    RE:    RIDGEWOOD WATER    VS THE 3M COMPANY
                    DOCKET: BER L -001447 19


    THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.


    DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.


    THE MANAGING JUDGE ASSIGNED IS:  HON MARY F. THURBER


    IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      002
AT:  (201) 527-2600.


    IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
    PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:
                            ATT: MATTHEW S. ROGERS
                            MATTHEW S. ROGERS
                            123 PROSPECT STREET
                            RIDGEWOOD        NJ 07451


ECOURTS

## SUMMONS

Attorney(s) <u>Matthew S. Rogers</u>

Office Address <u>Law Offices of Matthew S. Rogers, L.L.C.</u>

Town, State, Zip Code <u>123 Prospect Street,</u>
<u>Ridgewood, NJ 07450</u>

Telephone Number <u>(201) 857-3700</u>

Attorney(s) for Plaintiff <u>Ridgewood Water</u>

<u>Ridgewood Water</u>
        Plaintiff(s)

        vs.

<u>3M Company, E.I. Du Pont De Nemours</u>

<u>& Company, The Chemours Company,</u>
        Defendant(s)

## Superior Court of New Jersey

<u>Bergen</u>        County

<u>Law</u>        Division

Docket No: <u>L-001447-19</u>

## CIVIL ACTION
## SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

 The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

 If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

 If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

<u>Michelle M. Smith</u>
Clerk of the Superior Court

DATED: <u>03/07/2019</u>

Name of Defendant to Be Served: <u>Chemguard Inc.</u>

Address of Defendant to Be Served: <u>One Stanton Street, Marinette, WI 54143-2542</u>

Revised 11/17/2014, CN 10792-English (Appendix XII-A)