# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| RIDGEWOOD WATER,<br><br>             Plaintiff,<br><br>     v.<br><br>3M COMPANY, EIDP, INC. (F/K/A E.I. DU PONT DE NEMOURS & COMPANY), THE CHEMOURS COMPANY, HONEYWELL INTERNATIONAL INC., TYCO FIRE PRODUCTS LP, CHEMGUARD INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., CORTEVA, INC., DUPONT DE NEMOURS, INC. (F/K/A DOWDUPONT, INC.), THE CHEMOURS COMPANY FC, LLC, KIDDE-FENWAL, INC., BASF CORPORATION, AMEREX CORPORATION, DYNAX CORPORATION, CLARIANT CORPORATION, CARRIER CORPORATION, AND DOES 1-50, INCLUSIVE,<br><br>             Defendants. | MDL No. 2873<br><br>Master Docket No. 2:18-mn-2873<br><br>Judge Richard Mark Gergel<br><br>Civil Action No. 2:19-cv-02198-RMG<br>*Ridgewood Water v. 3M Company et al.*,<br><br>**SECOND AMENDED COMPLAINT**<br><br>Jury Trial Demanded |

## TABLE OF CONTENTS

I.      **Introduction** ............................................................................................................... 1

II.     **Parties** ....................................................................................................................... 3

III.    **Jurisdiction and Venue** ............................................................................................ 10

IV.     **Factual Allegations** ................................................................................................. 12

        A.      PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory
                Standards ....................................................................................................... 12

        B.      Manufacturer Defendants' Production of PFAS Products ........................... 13

        C.      Manufacturer Defendants' Production and Commercialization of AFFF ............... 14

        D.      Defendants' Knowledge of Threats Posed by Their PFAS Products ....................... 15

        E.      Major Sources of PFAS in the Environment ............................................... 20

        F.      Ridgewood Is Injured .................................................................................... 21

        G.      Treatment of PFOA and PFOS ..................................................................... 23

        H.      Old DuPont's Multi-Step, Fraudulent Scheme to Isolate Its Valuable Tangible
                Assets from Its PFAS Liabilities and Hinder Creditors ............................. 23

                i.      Step 1: The Chemours Spinoff .......................................................... 27

                ii.     Step 2: The Old Dow/Old DuPont "Merger" .................................... 32

                iii.    Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets
                        Away from Old DuPont and Separation of Corteva and New Dow ................... 34

        I.      The Effect of the Years-Long Scheme to Defraud Ridgewood and Other
                Creditors and Avoid Financial Responsibility for Legacy Liabilities ...................... 38

V.      **Causes of Action** ..................................................................................................... 41

        FIRST CAUSE OF ACTION
        Strict Products Liability for Defective Design ................................................... 41

        SECOND CAUSE OF ACTION
        Strict Products Liability for Failure to Warn ..................................................... 45

        THIRD CAUSE OF ACTION
        Negligence .......................................................................................................... 48

FOURTH CAUSE OF ACTION
Trespass ........................................................................................................ 52

FIFTH CAUSE OF ACTION
Actual Fraudulent Transfer in Relation to Chemours Spinoff ............................. 54

SIXTH CAUSE OF ACTION
Constructive Fraudulent Transfer in Relation to Chemours Spinoff ................... 56

SEVENTH CAUSE OF ACTION
Actual Fraudulent Transfer in Relation to Dow-DuPont Merger and Subsequent
Restructurings, Asset Transfers, and Separations ............................................. 58

EIGHTH CAUSE OF ACTION
Constructive Fraudulent Transfer in Relation to Dow-DuPont Merger and Subsequent
Restructurings, Asset Transfers, and Separations ............................................. 59

VI.   **Designation of Trial Counsel** ........................................................... **62**

VII.  **Certification Pursuant to Rule 4:5-1** .............................................. **62**

VIII. **Demand for Jury Trial** ...................................................................... **63**

Plaintiff Ridgewood Water ("Ridgewood"), a public drinking water provider having its principal office at 131 North Maple Avenue, in the Village of Ridgewood in the County of Bergen, State of New Jersey, by and through its attorneys, files this Second Amended Complaint against the above-named defendants and alleges as follows:

## I.     Introduction

1.     Ridgewood brings this action to recover the substantial costs necessary to protect the public and restore its damaged drinking water supply wells from exposure to and contamination with toxic per- and poly-fluroalkyl substances ("PFAS"), including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"), from Defendants' products.[1]

2.     Defendants 3M Company, EIDP, Inc. (f/k/a E.I. DuPont de Nemours and Company), The Chemours Company, The Chemours Company FC, LLC, Honeywell International Inc., Tyco Fire Products LP (successor-in-interest to Ansul Co.), Chemguard Inc., Buckeye Fire Equipment Company, National Foam, Inc. Kidde-Fenwal, Inc., BASF Corporation, Amerex Corporation, Dynax Corporation, Clariant Corporation, Carrier Global Corporation, and DOE Defendants 1-50 (collectively, "Manufacturer Defendants"), manufactured, marketed, sold, and/or promoted PFOA, PFOS, products containing PFOA and/or PFOS, and/or products that degrade to PFOA and/or PFOS upon release to the environment (collectively, "PFAS Products"), including but not limited to fluoropolymers and aqueous film-forming foam ("AFFF"), a firefighting product used on flammable liquid fires. Defendants EIDP, Inc., The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and Dupont de Nemours, Inc. (f/k/a DowDuPont, Inc.) (collectively, "Fraudulent Transfer Defendants") engaged in a series of fraudulent transfers to

---

[1] Ridgewood reserves its right to bring additional claims should it incur injuries attributable to the presence of other PFAS in its wells.

obstruct potential creditors, like Ridgewood, from accessing assets sufficient to satisfy legal liabilities arising from the manufacture, sale, and promotion of PFAS Products and/or products that degrade to PFAS upon release to the environment.

3.      PFAS are toxic, not easily biodegradable, persistent in the environment, and pose a significant risk to human health and safety. PFAS are associated with a variety of illnesses, including cancer, and considered particularly dangerous to pregnant women and young children.

4.      Manufacturer Defendants knew or should have known that PFAS are highly soluble in water; extremely mobile; persistent; very likely to contaminate surface and groundwater, including drinking supplies; and present significant risks to human health and welfare if released to the environment.

5.      Nonetheless, Manufacturer Defendants manufactured, marketed, sold, and/or promoted PFAS; products containing PFAS; and/or products that products that would degrade to PFAS upon release to the environment to industrial facilities and consumers in New Jersey, with the knowledge that those compounds would be discharged to the land and water in New Jersey as a waste product of certain industrial manufacturing processes, during normal use and disposal of such products, and/or during firefighting training and rescue exercises and in firefighting emergencies, among other normal and foreseeable uses.

6.      Ridgewood files this lawsuit to recover compensatory damages and all other available remedies, including, but not limited to, all necessary funds to reimburse Ridgewood for the costs of designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA and PFOS from its drinking water wells, and all associated costs and damages, and to ensure that the parties responsible for the drinking water contamination bear these expenses, rather than Ridgewood and its ratepayers.

## II.     Parties

7.      **Plaintiff Ridgewood Water** is a public drinking water provider that serves approximately 61,700 customers in Bergen County, New Jersey. Ridgewood's service area spans four municipalities: the Boroughs of Glen Rock and Midland Park, the Township of Wyckoff, and the Village of Ridgewood.

8.      Ridgewood operates 52 municipal supply wells distributed throughout its service area. Ridgewood also obtains a portion of its water via interconnections with other water utilities, including Suez Water New Jersey and Hawthorne Water Department.

9.      Forty-four of Ridgewood's fifty-two wells are already contaminated with PFOA and PFOS. PFOA and PFOS are spreading throughout the aquifer system from which Ridgewood draws its drinking water supply, further threatening Ridgewood's already-contaminated wells, untested but potentially contaminated wells, and as-yet uncontaminated wells.

10.     **Defendant 3M Company** ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M does business throughout the United States, including in New Jersey. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold PFAS and/or PFAS Products for use in its own and other products manufactured throughout the country, including in New Jersey; and AFFF containing PFOA and/or PFOS used to fight fires in New Jersey.

11.     **Defendant EIDP, Inc.** ("Old DuPont"), f/k/a E.I. du Pont de Nemours & Company is a Delaware corporation with its principal place of business in Wilmington, Delaware. Old DuPont does business throughout the United States, including in New Jersey. Old DuPont marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS and/or PFAS Products, including in

New Jersey. Old DuPont has operated facilities in New Jersey that manufacture PFAS and/or PFAS Products, and that are known to have caused PFOA and PFOS contamination to surrounding groundwater aquifers.

12.     **Defendants The Chemours Company and The Chemours Company FC, LLC** are Delaware corporations with their principal places of business in Wilmington, Delaware. These Defendants are collectively referred to as "Chemours" or "the Chemours Defendants" and do business throughout the United States, including in New Jersey and in this District. In 2015, Old DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to Chemours. The fluoroproducts and chemical solutions businesses appear to have been transferred to both The Chemours Company and the Chemours Company FC, LLC. The Chemours Company was incorporated as a subsidiary of Old DuPont until approximately April of 2015, and The Chemours Company FC, LLC was formed as a subsidiary around the same time. In approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of Old DuPont's performance chemical business and began operating as an independent company. As part of this spinoff, Chemours assumed certain environmental liabilities associated with Old DuPont's historical business lines, including those related to PFOA and other PFAS Products. Old DuPont and Chemours have both engaged in the manufacture, distribution, marketing, promotion, and sale of PFAS Products and AFFF Products, and have fraudulently conveyed the assets and liabilities in the DuPont-Chemours spin-off. Chemours has filed a complaint against Old DuPont in the Delaware Chancery Court seeking declaratory relief related to the allocation of various environmental liabilities.

13.     **Defendant Corteva, Inc.** ("Corteva") is a Delaware corporation with its principal place of business in Wilmington, Delaware. Corteva does business throughout the United States,

including in this District and in New Jersey. Corteva was formed through a series of transactions initiated by the merger of Old DuPont and the Dow Chemical Company ('Dow") in August of 2017, which formed DowDuPont, Inc. ("DowDuPont"). Old DuPont and Dow each became subsidiaries of DowDuPont. Corteva was formed as a subsidiary of DowDuPont in 2018, and in approximately June 2019, DowDuPont spun off its agricultural business to Corteva. Corteva is the parent of Old DuPont, holds all of Old DuPont's outstanding stock, and holds some of DowDuPont's assets and liabilities, including its agricultural and nutritional businesses, which in turn likely include business lines and liabilities relating to the manufacture, marketing, distribution, and/or sale of PFAS Products and other fluorochemical products.

14.    **Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont, Inc.)** ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. New DuPont does business throughout the United States, including in New Jersey. DowDuPont became New DuPont following the Corteva spin-off, described above. New DuPont holds assets in the specialty products businesses, and the remainder of the financial assets and liabilities that Old DuPont held after the aforementioned spin-offs. Presumably, these assets and liabilities are valued at billions of dollars and are related to Old DuPont's historic PFAS manufacture, marketing, distribution, and/or sale. New DuPont also apparently continues to manufacture, market, distribute, and/or sell PFAS Products and other fluorochemical products.

15.    Defendants Old DuPont, New DuPont, the Chemours Defendants, and Corteva are collectively referred to herein as the "Fraudulent Transfer Defendants."

16.    **Defendant Honeywell International Inc.** ("Honeywell") is a Delaware corporation with its principal place of business in Morris Plains, New Jersey. Honeywell is a successor -in-interest to Allied Chemical Corporation ("Allied"). Allied, and Honeywell in its own

right, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS and/or PFAS Products, including in New Jersey. Allied, and Honeywell in its own right, have operated multiple facilities in New Jersey at which PFAS Products were manufactured. Such products were then sold to third parties, including in New Jersey.

17.     **Defendant Tyco Fire Products, LP** ("Tyco") is a Delaware limited partnership, with its principal place of business in Lansdale, PA. Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul"), a corporation organized under the laws of Wisconsin (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). At all times relevant, Tyco/Ansul manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other PFAS Products, including in New Jersey.

18.     **Defendant Chemguard Inc.** ("Chemguard") is a Wisconsin corporation with its principal place of business in Marinette, Wisconsin. At all times relevant, Chemguard manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other PFAS Products, including in New Jersey.

19.     **Defendant Buckeye Fire Equipment Company** ("Buckeye Fire") is a North Carolina corporation with its principal place of business in Mountain, North Carolina. At all times relevant, Buckeye Fire manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other PFAS Products, including in New Jersey.

20.     **Defendant National Foam, Inc**., (collectively "National Foam"), is a Delaware corporation with its principal place of business in Angier, North Carolina. National Foam manufactures the Angus brand of products and is successor-in-interest to Angus International

Safety Group, Ltd. At all times relevant, National Foam manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other PFAS Products, including in New Jersey.

21.    **Defendant Kidde-Fenwal, Inc.** ("Kidde") is a Delaware corporation with its principal place of business in Ashland, Massachusetts. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in New Jersey and in this District. Kidde manufactured, marketed, promoted, distributed, and/or sold AFFF that contained and/or degraded to PFOA, PFOS, and other toxic substances.

22.    **Defendant BASF Corporation** ("BASF") is a subsidiary of Badische Anilin und Soda Fabrik SE headquartered in Ludwigshafen, Germany. BASF Corporation does business throughout the United States and its headquarters and principal place of business is in Florham Park, New Jersey. BASF Corporation is incorporated in Delaware. As part of its North American operations, BASF own four research hubs, one of which is located in Tarrytown, New York. BASF is the second largest chemical producer and marketer in North America and sells firefighting foam as one of its chemical products. At all relevant times, BASF manufactured, marketed, promoted, distributed, and/or sold AFFF products, including but not limited to fluorosurfactants, other fluorochemical products, and/or precursor chemical products that contain or degrade to PFOA and/or PFOS, in New Jersey.

23.    **Defendant Amerex Corporation** ("Amerex") is headquartered in and has its principal place of business in Trussville, Alabama. It is incorporated in Alabama. Amerex has dozens of distributors located in New York and New Jersey. At least one of Amerex's warehouses is located in New Jersey. Amerex manufactures and distributes AFFF and AFFF products,

including but not limited to fluorosurfactants and other PFAS Products. At all relevant times, Amerex manufactured, marketed, promoted, distributed, and/or sold these products in New Jersey.

24. **Defendant Dynax Corporation** ("Dynax") has its headquarters and principal place of business in Pound Ridge, New York. It is incorporated in Delaware. Dynax has been a leading producer of specialized fluorochemicals since its founding in 1991. Dynax has been a member of the FluoroCouncil as a representative of the firefighting industry. Dynax has been a primary fluorosurfactant provider for at least Defendants 3M and National Foam within the relevant time period. Dynax has manufactured, marketed, promoted, distributed, and/or sold AFFF products, including but not limited to fluorosurfactants and other PFAS Products, in New Jersey.

25. **Defendant Clariant Corporation** ("Clariant") is incorporated in New York and has a principal place of business in Charlotte, North Carolina. Clariant is a subsidiary of Clariant Ltd, a Swiss company with headquarters in Muttenz, Switzerland, and with subsidiaries throughout the United States. Clariant recently opened a Consumer Care Innovation Center in New Providence, New Jersey. Clariant was also involved in a hazardous waste cleanup in Fair Lawn, New Jersey. Clariant manufactures PFAS Products, including but not limited to products that are or contain PFOS and/or PFOA and that are used in AFFF products, such as fluorosurfactants. Clariant provided fluorosurfactants to at least Defendant Dynax. Further, AFFF products containing PFOA and/or PFOS manufactured, distributed, sold, marketed, and/or promoted by Clariant were used in New Jersey and released into the environment.

26. **Defendant Carrier Global Corporation** ("Carrier") has headquarters and a principal place of business in Palm Beach Gardens, Florida. It is incorporated in Delaware. Carrier was acquired by United Technologies Corporation in 1979 and spun off in April 2020 as an independent company and is now the parent company of Defendant Kidde-Fenwal. Carrier has

locations in Pittsford, Syracuse, and New York City, New York, in addition to Clifton, Totowa, and Jamesburg, New Jersey. Carrier owns and operates nineteen fire and security companies. Carrier and its subsidiaries have produced and sold AFFF and other PFAS Products. At all relevant times, Carrier manufactured, marketed, promoted, distributed, and/or sold these AFFF and other PFAS Products in New Jersey.

27.     When reference is made in this Second Amended Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

28.     All references to a Defendant or Defendants in this Second Amended Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

29.     **Doe Defendants**: Except as described herein, Ridgewood is ignorant of the true names of Defendants sued as Does 1 through 50, inclusive, and, therefore, Ridgewood sues these defendants by fictitious names. Following further investigation and discovery, Ridgewood will seek leave of this Court to amend this Second Amended Complaint to allege their true names and capacities when ascertained. Ridgewood is informed and believes, and on that basis alleges, that each of these fictitiously named Defendants is a manufacturer, supplier, promoter, distributor, and/or seller of PFAS Products, and is responsible in some manner for the acts alleged herein.

30.     These fictitiously named Defendants aided and abetted and/or conspired with the named Defendants in the wrongful acts and course of conduct or otherwise caused the damages

and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Second Amended Complaint.

31.     Defendants 3M, Old DuPont, The Chemours Company, The Chemours Company FC, LLC, Honeywell, Tyco, Chemguard, Buckeye Fire, National Foam, Inc. Kidde, BASF, Amerex, Dynax, Clariant, Carrier, and DOE Defendants 1-50 are collectively referred to herein as the "Manufacturer Defendants."

## III.     Jurisdiction and Venue

32.     Jurisdiction is proper in the Superior Court of New Jersey Law Division, Bergen County, where Ridgewood originally filed suit on February 25, 2019 (Case No. BER-L-001447-19). Defendants Tyco and Chemguard removed the action to the United States District Court for the District of New Jersey (Case No. 2:19-cv-09651). Ridgewood timely moved to remand the action to the Superior Court of New Jersey Law Division, Bergen County for lack of federal subject-matter jurisdiction pursuant to 28 U.S.C. § 1447(c). On August 6, 2019, pursuant to 28 U.S.C. § 1407, this action was transferred to this Court and assigned to the Honorable Richard M. Gergel for coordinated or consolidated pretrial proceedings with other actions already centralized in the multidistrict litigation *In re: Aqueous Film-Forming Foams Products Liability Litigation* (MDL No. 2873). This Court has denied Ridgewood's motion to remand and ruled that it has jurisdiction under 28 U.S.C. § 1442(a)(1). By filing this Second Amended Complaint, Ridgewood in no way concedes that this Court, or the United States District Court for the District of New Jersey, has subject-matter jurisdiction over this action. Ridgewood reserves all rights with respect to whether jurisdiction is proper in federal court.

33.     The Superior Court of New Jersey Law Division, Bergen County has personal jurisdiction over Defendants pursuant to R. 4:4-4(a)(6) and/or R. 4:4-4(b)(1). At all times

relevant to this Second Amended Complaint, each Defendant has engaged in substantial business with and has substantial connections and/or contacts with the State of New Jersey, including designing, developing, manufacturing, promoting, selling, distributing, storing, handling, using, and/or disposing of PFAS Products in New Jersey. Defendants' acts and omissions—conducted both within and outside of New Jersey—were a cause of the in-state injuries alleged in this Second Amended Complaint. Defendants' connections with the State of New Jersey also satisfy the requirements of the Due Process Clause of the Fourteenth Amendment. Each Defendant has purposefully availed itself of the privilege of conducting business in New Jersey. The causes of action in this Second Amended Complaint arise from Defendants' design, manufacture, promotion, sale, distribution, use, and/or disposal of PFAS Products—or assumption of liabilities related thereto—conduct that occurred both within and outside of New Jersey. In light of these substantial business connections with New Jersey, the exercise of the Superior Court of New Jersey Law Division, Bergen County's jurisdiction over Defendants is reasonable and consistent with traditional notions of fair play and substantial justice.

34.     Venue is proper in Bergen County, New Jersey, Superior Court under R. 4:3-2(a) because Ridgewood's causes of action arose in Bergen County and because Ridgewood's principal place of business is in Bergen County.

35.     Assuming federal subject-matter jurisdiction is proper, venue is proper in the District of New Jersey because the action was removed to the District of New Jersey, located where the state action was pending. 28 U.S.C. §§ 1390(c), 1441(a). Alternatively, venue is proper in the District of New Jersey pursuant to: 1) 28 U.S.C. § 1391(b)(1) because all Defendants reside in the District of New Jersey as that term is defined in 28 U.S.C. § 1391(c) and other law, and 2) 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the

claims occurred in the District of New Jersey, and because the property that is the subject of the action is situated in the District of New Jersey.

## IV.  Factual Allegations

### A.  PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory Standards

36.     PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. The PFAS family of chemicals is entirely manmade and does not occur in nature. PFOA and PFOS are among the most toxic chemicals in the PFAS family.

37.     PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they are soluble and do not adsorb (stick) to soil particles, and they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

38.     PFOA and PFOS bioaccumulate and biomagnify in people and other organisms.

39.     Scientists link PFOA and PFOS with a wide range of serious public health impacts.

40.     PFOA and PFOS contamination presents a serious threat to public health through drinking water.

41.     PFOA and PFOS enter the environment from industrial facilities that manufacture PFOA or PFOS, or that use PFOA, PFOS, or products that degrade to PFOA or PFOS in the

manufacture or production of other products (collectively, "PFAS Products"). Releases to land and water from a multitude of industrial sites are known pathways to the environment. PFOA and PFOS may also enter the environment when released from PFOA- or PFOS-containing consumer and commercial products during their use and disposal.

42.     In October 2017, the New Jersey Department of Environmental Protection ("DEP") announced that it would accept the Drinking Water Quality Institute's recommendation of a health-based maximum contaminant level ("MCL") of 14 parts per trillion ("ppt") for PFOA. In August 2018, DEP accepted the Institute's recommendation for an MCL of 13 ppt for PFOS. The State of New Jersey also established in September 2018 an MCL of 13 ppt for perfluorononanoic acid ("PFNA"), a related PFAS. The establishment of the health-based MCLs triggers certain State regulatory requirements governing Ridgewood's wells and operations; in some circumstances action is required even if current levels contamination levels are below the MCL to protect against MCL exceedances. Such State requirements include, but are not limited to, required investigatory and remedial action by public water suppliers to protect public health, including by taking action to remove PFAS contamination from water in its wells.

**B.  Manufacturer Defendants' Production of PFAS Products**

43.     PFAS were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

44.     For most of the past several decades, 3M has been the primary manufacturer of PFOA and PFOS.

45.     3M began producing PFOA and PFOS as raw materials that they used to produce other products, or that they sold to third parties for use in other products. 3M produced PFOA and PFOS by electrochemical fluorination in the 1940s. This process results in a product that contains

and/or breaks down into compounds containing PFOA and/or PFOS. 3M went on to market several PFAS Products, including AFFF, its Scotchguard brand of stain repellant, food packaging, textile treatments, flurosurfactants and additives, and others. 3M ceased PFOA production in 2002 under pressure from the U.S. EPA.

46.     Old DuPont began production for sale of polytetrafluoroethylene ("PTFE") in or around 1951. The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. Old DuPont marketed its PTFE under the trade name "Teflon." PTFE is a fluoropolymer (i.e. a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water or oil; a lubricant; a coating for catheters and other medical equipment; an oxidizer in flares; in dental fillings; and many others. Old DuPont has produced and produces numerous other PFAS Products. Old DuPont also began producing PFOA as a raw material for its own use and for sale in or around 2002, after 3M ceased PFOA production.

47.     Honeywell began producing fluoropolymers in New Jersey in or around 1963, eventually building a plant that produced 3 million pounds of PTFE annually. Honeywell has produced other PFAS Products, including organic pigments, other fluropolymer dispersions, and fluropolymer resins. Honeywell marketed its PFAS Products to other industrial users, including for use in the computer industry; in manufacturing valves, fittings, and other connections; as ball bearings or sliding parts; and other applications.

**C.  Manufacturer Defendants' Production and Commercialization of AFFF**

48.     AFFFs are synthetically formed by combining fluorine-free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, a solution forms producing aqueous film that spreads across the surface of a hydrocarbon fuel. This film formation feature is

what provides the fire extinguishment.

49.    In the 1960s, 3M began developing firefighting foams containing PFOA to suppress flammable liquid fires. In the early 1970s, 3M began producing solely PFOS-based AFFF.

50.    Tyco, Chemguard, Buckeye, and National Foam entered the AFFF business at various times since the early 1970s. These Defendants used a process called telomerization to produce the fluorinated surfactants contained in their firefighting foams. Telomer-based foams do not contain or degrade into PFOS, and are not made with PFOA, but may contain those compounds as impurities from the manufacturing process. These telomer-based foams contain other PFAS, and are therefore distinguishable from 3M-produced AFFF.

51.    After its creation in the 1960s AFFF was widely used across the country.

52.    AFFF users have long conducted exercises, including firefighting and explosion training, where AFFF was sprayed directly on the ground, as Defendants instructed, which allowed PFAS to travel to surrounding surface water, sediment, and groundwater.

53.    Some federal and/or federally-regulated facilities purchased AFFF manufactured to military specifications, known as "Milspec." AFFF Mil-Spec sets out only performance specifications, not manufacturing or production specifications. While Mil-Spec calls for a "fluorinated surfactant," there are thousands of such compounds.

54.    Milspec specifications do not govern or apply to the general formulation and sale of AFFF sold for commercial use. As such, Milspec did not and does not apply to any commercial transactions involving AFFF that do not involve either the military or a federally-regulated airport.

**D.  Defendants' Knowledge of Threats Posed by Their PFAS Products**

55.    For more than 50 years, Manufacturer Defendants were or should have been aware of the dangers to people of environmental exposure to their PFAS Products (including via drinking

water); and that the production and use of PFAS Products resulted in the release of PFAS to the environment. Despite this knowledge, Manufacturer Defendants failed to adequately investigate and test their products to ensure they would not cause harm to the public; and continued their PFAS Products production and marketing practices without eliminating the defects in their products, and without warning of the known dangers of their products. These measures could have eliminated or reduced damage and injuries to Ridgewood's drinking water production wells.

56.     By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

57.     3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

58.     Old DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

59.     As early as 1963, 3M was aware that its PFAS Products were stable in the environment and would not degrade after disposal.

60.     By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

61.     By at least 1970, 3M was aware that its PFAS Products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

62.     In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that their products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

63.     As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS' health effects.

64.     Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. Old DuPont was aware of 3M's findings no later than 1981.

65.     Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to C8, Old DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

66.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

67.     According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own

ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, that resistance had not ceased.

68.    In 1981, Old DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

69.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

70.    Old DuPont was long aware it was releasing from its facilities PFAS that were leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont facilities in West Virginia and Ohio, Old DuPont in 1984 held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). Old DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. Old DuPont chose not to use either, despite knowing of PFOA's toxicity.

71.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed Old DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use in 3M's business, and had "no incentive to take any other position."

72.    In 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

73.     By at least 1993, Manufacturer Defendants were aware that PFAS were linked to increased cancer rates in humans exposed to their PFOA products. 3M memos show that in 1993, it worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

74.     Despite its understanding of the hazards associated with its PFAS Products, 3M actively sought to suppress scientific research on the hazards associated those products, and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health and ecological risks of its PFAS Products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFCs] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

75.     In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

76.     All Manufacturer Defendants knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment. This knowledge was accessible to all Manufacturer Defendants.

E.  **Major Sources of PFAS in the Environment**

77.     Manufacturing facilities where Manufacturer Defendants' PFAS Products are synthesized and made into products or chemical feedstocks, or where PFOA and PFOS are used as processing aids, as well as secondary manufacturing facilities where PFAS Products such as PTFE are applied to other products, are major PFOA and PFOS release sites. Industries that are known sources of PFOA and PFOS releases to the environment include textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. PFAS releases at industrial sites are generally due to direct wastewater discharge, as well as accidental releases such as leaks or spills.

78.     There are several current and former industrial sites near Ridgewood's wells or located in the vicinity of sources of Ridgewood's water supply that are likely to have contributed to the release of PFOA and PFOS from Defendants' PFAS Products, and consequent contamination of Ridgewood's wells. Such sites include, but are not limited to, the Saint-Gobain Performance Plastics facility in Wayne, the former International Wire Products Company site in Wyckoff, the former George Glove Company site in Midland Park, the Tam Metal Products site in Mahwah, and stone cutting businesses in Ridgewood Junction.

79.     Fire suppression and fire-fighting training activities are sources of PFAS releases to the environment, via the discharge of AFFF. For decades, Manufacturer Defendants did not warn AFFF users of PFOA and PFOS's existence in AFFF, the hazards associated with PFOA and PFOS in AFFF, or the mobility and persistence of PFOA and PFOS released to the environment when AFFF was used as instructed by Manufacturer Defendants by spraying it directly on the ground during fire training exercises. The use of AFFF to extinguish fires allowed PFOA and

PFOS to escape into the ground and migrate to surrounding public and private drinking water wells. As such, sites where AFFF was used, including fire training areas, sites of past emergency response incidents, airports, and other areas where AFFF has been stored and accidentally released, are substantial contributors to PFOA and PFOS contamination. Throughout the time AFFF containing PFOA and PFOS have been used, the instructions, warning labels, and material safety data sheets that were provided with the AFFF by the Manufacturer Defendants did not fully identify and notify customers, users, regulators, public water suppliers, or the public concerning the health and environmental hazards of AFFF, of which Manufacturer Defendants knew or should have known.

80.     There are several known AFFF release sites near Ridgewood's wells that likely have contributed to the release of Manufacturer Defendants' PFAS and consequent contamination of Ridgewood's wells, including, but not limited to, municipal facilities such as the Bergen County Law and Public Safety Institute in Mahwah and the Ridgewood Fire Department in the Village of Ridgewood; and locations of past fire suppression activities, such as the site of a large fire in 2015 at an electrical substation on Hopper Road near Ho-ho-kus Brook.

81.     Ridgewood has diligently investigated known and potential sources of PFAS contamination in the District's wells and water supply. Ridgewood cannot identify any military or federally-regulated airport as a source of such PFAS contamination, and on that basis alleges that the PFAS contamination in its wells is not from such sources.

82.     There are no U.S. government military sites or federally-regulated facilities that are release sites/sources of contamination of Ridgewood's wells.

**F. Ridgewood Is Injured.**

83.     PFOA and PFOS have been detected in varying amounts at varying times in nearly

all of Ridgewood's wells. A substantial portion of those wells have tested above the proposed MCL for PFOA, and at levels approaching and in some cases exceeding the proposed MCL for PFOS. An additional, substantial portion of Ridgewood's wells exceed levels that are injurious, including because regulatory standards require actions at levels below MCLs. In addition, PFOA and PFOS's high mobility and persistence in soil and groundwater means they will likely continue to spread and affect even more of Ridgewood's wells in the future.

84.     Manufacturer Defendants' PFAS Products are the major sources of the PFOA and PFOS released to the environment that ultimately reached groundwater that supplies Ridgewood's production wells. PFOA and PFOS have reached those wells due to the routine, foreseeable, and intended use and disposal of Manufacturer Defendants' PFAS Products in the vicinity of locations from which Ridgewood obtains water, including its groundwater wells, and source sites for imported water. Such use, disposal, and environmental transport has brought PFOA and PFOS to Ridgewood's wells from releases at a myriad of diffuse sources, including, but not limited to, industrial and manufacturing facilities and businesses; fire suppression and training sites; AFFF storage sites; locations where PFAS-contaminated water is used for irrigation; sites where consumer products are disposed; and others.

85.     To address PFOA and PFOS contamination in its wells, Ridgewood has, *inter alia*, removed from service wells with elevated PFOA and PFOS levels; and incurred expenses in developing plans to address PFOA and PFOS in a subset of its wells, including by planning to add wellhead treatment. Ridgewood anticipates taking these and additional steps to address the continuing and future PFOA and PFOS contamination in its wells attributable to Manufacturer Defendants' tortious conduct.

### G. Treatment of PFOA and PFOS

86.     The most viable technologies to remove PFAS compounds from drinking water are granular activated carbon treatment ("GAC"), reverse osmosis, electrochemical oxidation, and anion exchange. Each of these technologies is extremely expensive to build, install, operate and maintain.

### H. Old DuPont's Multi-Step, Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities and Hinder Creditors

87.     Old DuPont sought to insulate itself from billions of dollars of legacy environmental liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country, and these efforts have included unlawful attempts to shield assets from liability for AFFF contamination, including liability for PFAS contamination in New Jersey.

88.     Old DuPont's potential cumulative liability related to PFOA and other PFAS, including PFAS-containing AFFF, is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

89.     For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey and West Virginia, and at Fayetteville Works in North Carolina. As alleged above, throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising

from its use of PFAS, including PFAS-containing AFFF.

90.     For example, in 1999, members of the Tennant family, who owned property impacted by PFOA contamination from a landfill that had accepted PFOA wastes from the nearby Old DuPont's Washington Works plant in West Virginia, sued Old DuPont in West Virginia federal court.

91.     Old DuPont's in-house counsel was very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

92.     In 2005, after settling the Tennant case, Old DuPont settled claims by EPA for violations of TSCA and RCRA related to PFAS.

93.     Also, in 2005, a West Virginia court entered a final order approving a 2004 settlement with Old DuPont of a class action lawsuit filed on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works.

94.     Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235 million for medical monitoring of the affected

community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could cause each of the linked diseases.

95.     By 2012, after seven years of studies, the Science Panel confirmed "probable links" between class-member exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

96.     After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and* Company *C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio. A number of trials were scheduled to take place in 2015 and 2016.

97.     Old DuPont must have known that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country, and that its liability was likely in the billions of dollars.

98.     Anticipating this significant liability exposure, Old DuPont had convened an internal initiative known as "Project Beta" on or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

99.    In furtherance of possible restructuring opportunities, including potential merger structures, in or around 2013, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals."

100.    However, neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS and environmental liabilities that Old DuPont faced.

101.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

102.    Old DuPont engaged in a three-part restructuring plan, as described below.

103.    The first step in Old DuPont's plan was to transfer its performance chemicals business (which included Teflon® and other products) ("Performance Chemicals Business") into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

104.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities and that Old DuPont still faced direct liability for its own conduct.

105.    The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was

created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

106.    Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

107.    The third step involved DowDuPont spinning off two new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

108.    As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

109.    New DuPont and Corteva now hold the vast majority of the tangible assets that Old DuPont formerly owned.

110.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have, likely intentionally, buried these details in an apparent attempt to hide from creditors, like Ridgewood, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

111.    In greater detail, the restructuring was implemented as follows.

      **i.    Step 1: The Chemours Spinoff**

112.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

113.    On April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

114.    On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals

Business, and Chemours became a separate, publicly traded entity.

115.    At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

116.    Prior to the Chemours Spinoff, Chemours's Board of Directors had three members, all of whom were Old DuPont employees.

117.    On June 19, 2015, a fourth member of the Board, who had served as a member of Old DuPont's Board of Directors from 1998 to 2015, was appointed.

118.    On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and seven new members were appointed to fill the vacancies.

119.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

120.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

121.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

122.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4

billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

123.    Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

124.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of Ridgewood here, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. The Chemours Separation Agreement also required Chemours to assume billions of dollars of Old DuPont's PFAS liabilities and includes an indemnification of Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

125.    Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

126.    Under the Chemours Separation Agreement, Chemours must indemnify Old

DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

127.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

128.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

129.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated and (ii) the Court does not limit Chemours's liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

130.    There was no meaningful, arms'-length negotiation of the Chemours Separation Agreement, and Old DuPont largely dictated its terms.

131.    In its Delaware lawsuit, Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel

prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

132.    Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products such as PFAS-containing AFFF, and in so doing, shield Old DuPont.

133.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

134.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

135.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

136.    For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

137.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

138.    For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multidistrict litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

139.    Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

**ii.     Step 2: The Old Dow/Old DuPont "Merger"**

140.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

141.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

142.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

143.    On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

144.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc. (i.e., New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

145.    Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

146.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

147.    The below image reflects the corporate organization following the "merger":



### iii. Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow

148.    Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

149.    It is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

150.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

151.    While the precise composition of these divisions, including many details of the

specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

152.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

153.    The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment:



154.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

155.    The agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

156.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, i.e., (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

157.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including the PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

158.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including Ridgewood's claims in this case.

159.    While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Ridgewood can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to Ridgewood's water resources.

160.     The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

161.     On or about May 2, 2019, DowDuPont consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont spun off Corteva as an independent public company.

162.     Corteva now holds 100% of the outstanding common stock of Old DuPont.

163.     The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

164.     The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont,

respectively,     following     the     separations     are     depicted     below:



165.     Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

166.     On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**I.**    **The Effect of the Years-Long Scheme to Defraud Ridgewood and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities**

167.     The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

168.     Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was

assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

169. In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

170. For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

171. Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

172. Also, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

173. That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

174. As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

175.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

176.    In addition, Ridgewood's position is not protected by the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

177.    Indeed, New DuPont—to which PFAS liabilities are allocated under the DowDuPont Separation Agreement—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value.

178.    New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

179.    In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital, a private equity firm.

180.    On December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances, Inc., a manufacturer and supplier of flavors and fragrances used in the food, beverage, personal care, and household products industries, for $26.2 billion. That transaction closed in February 2021.

181.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron, a global maker of semiconductor wafers.

182.    In addition, New DuPont has issued Notices of Intent to Sell relating to six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the

Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

183.    Old DuPont's parent holding company, Corteva—to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied— holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

184.    The Chemours Spinoff constitutes a fraudulent transfer, which entitles Ridgewood to, among other things, avoid the transaction and recover property or value transferred from Chemours in the transaction. The Dow-DuPont Merger and subsequent separations of New DuPont and Corteva likewise constitute fraudulent transfers that entitle Ridgewood to, among other things, recover property and value transferred to New DuPont and Corteva.

## V.     Causes of Action

### FIRST CAUSE OF ACTION
### Strict Products Liability for Defective Design
### (Against All Defendants)

185.    Ridgewood realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

186.    As manufacturers and/or sellers of PFAS Products, Manufacturer Defendants had a strict duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses, and owed that duty both to reasonably foreseeable users of those products and to any person who might reasonably be expected to come into contact with those products.

187.    Manufacturer Defendants knew that third parties would purchase PFAS Products and use them without inspection for defects.

188.    PFAS Products purchased or otherwise acquired (directly or indirectly) from Manufacturer Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or waters. Such discharges occurred at various locations, at various times, and in various amounts. PFOA and PFOS resulting from such discharges moved through the environment and did not degrade, and eventually contaminated Ridgewood's wells.

189.    The PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

190.    Manufacturer Defendants knew or reasonably should have known that the use of their PFAS Products in an intended or reasonably foreseeable manner would result in the spillage, discharge, disposal, or release of PFOA and PFOS onto land or into water such that PFOA and PFOS foreseeably contaminated Ridgewood's wells.

191.    The PFAS Products that are injuring Ridgewood's wells are defective in design and unreasonably dangerous because, among other things:

a.    PFOA and PFOS cause extensive and persistent contamination when they, or products containing them, are used in a reasonably foreseeable or intended manner.

b.    PFOA and PFOS contamination in groundwater and surface water that are the sources of drinking water poses significant threats to public health and welfare.

c.    Manufacturer Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFAS Products.

192.    At all times relevant to this action, PFAS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and the foreseeable risk of harm to public health and welfare via drinking water contamination posed by PFAS Products outweighed the cost to Manufacturer Defendants of reducing or eliminating such risk.

193.    Manufacturer Defendants knew or should have known about reasonably safer feasible alternatives to PFAS Products, and the omission of such alternative designs rendered Manufacturer Defendants' products not reasonably safe.

194.    As a direct and proximate result of the defects previously described, Ridgewood's wells became contaminated with PFOA and PFOS in varying amounts over time, causing Ridgewood significant injury and damage.

195.    As a direct and proximate result of Manufacturer Defendants' acts and omissions as alleged herein, Ridgewood has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

196.    Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of Ridgewood's wells. Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFAS Products, or to reduce or eliminate expenses Manufacturer Defendants would otherwise have incurred to remove PFOA and PFOS from their waste streams, despite the impacts on Ridgewood's wells and on public health and welfare. Therefore, Ridgewood requests an award of punitive damages for Manufacturer Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Ridgewood

requests an award of punitive damages in an amount sufficient to punish these Manufacturer Defendants and that fairly reflects the aggravating circumstances alleged herein.

197.    Manufacturer Defendants are strictly, jointly, and severally liable for all such damages, and Ridgewood is entitled to recover all such damages and other relief as set forth below.

198.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liabilities relating to this cause of action.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Defendants, jointly and severally, for

a.    Declaratory judgment that Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in Ridgewood's wells as described herein and to compensate Ridgewood for the lost value and benefits its wells during all times of injury caused by Defendants' PFAS Products, and for such orders as may be necessary to provide full relief to address the risks to Ridgewood and its customers;

b.    Compensatory damages for all injuries Ridgewood has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Defendants' PFAS Products, and their wrongful marketing and promotion thereof; and for all other injuries sustained by Ridgewood as a direct and proximate result of Defendants' acts and omissions alleged herein, according to proof, including, but not limited to remedial, administrative, oversight, and legal expenses and compensation for damages to Ridgewood's wells;

c.    Punitive damages in an amount to be determined at trial;

d.     Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

e.     Such other relief as this Court deems equitable, just, and appropriate.

### SECOND CAUSE OF ACTION
### Strict Products Liability for Failure to Warn
### (Against All Defendants)

199.     Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

200.     As manufacturers and/or sellers of PFAS Products, Manufacturer Defendants had a strict duty to Ridgewood to warn users of those products of the foreseeable harms associated with those products.

201.     Manufacturer Defendants inadequately warned users and buyers of their PFAS Products of the likelihood that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases. To the extent Manufacturer Defendants provided warnings about their products, such warnings did not convey a fair indication of the nature and extent of the hidden dangers of Manufacturer Defendants' products to the mind of a reasonable user, because, among other things, they lacked descriptions of the nature and extent of the contamination of drinking water production wells that resulted from those products. Indeed, despite Manufacturer Defendants' own unique knowledge of such hazards, they elected to withhold such knowledge from Ridgewood, regulators, and the public; to affirmatively distort and/or suppress their knowledge and the scientific evidence linking their products to such hazards; and to instruct users to release their products directly to the ground where PFOA and PFOS therein could infiltrate drinking water supplies.

202.     Manufacturer Defendants failed to warn of the hidden dangers associated with their

PFAS Products before those products left their control, and at all stages of the chain of commerce; at no time relevant to this Second Amended Complaint did Manufacturer Defendants warn that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

203.    Manufacturer Defendants' PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

204.    PFAS Products purchased or otherwise acquired (directly or indirectly) from Manufacturer Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water that are pathways to the groundwater that supplies Ridgewood's drinking water production wells.

205.    Manufacturer Defendants knew or should have known that the use of PFAS Products in their intended manners would result in the discharge, disposal, or release of PFOA and PFOS onto land or into water, such that PFOA and PFOS would contaminate drinking water supplies.

206.    The PFAS Products used and disposed of in a manner that caused contamination in Ridgewood's wells were defective in design and unreasonably dangerous products for the reasons set forth in Paragraphs 80, 81, and 82, *supra*.

207.    Ridgewood's wells reasonably should have been expected to come into contact with PFOA and PFOS from Manufacturer Defendants' products.

208.    Had Manufacturer Defendants provided adequate warnings about the hazards associated with their PFAS Products, third party users would have heeded that warning.

209.    As a direct and proximate result of Manufacturer Defendants' failure to warn of the hazards of their PFAS Products that were, or reasonably should have been, known to them, Ridgewood's wells are contaminated with PFOA and PFOS.

210.    As a direct and proximate result of Manufacturer Defendants' acts and omissions as alleged herein, Ridgewood has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

211.    Manufacturer Defendants knew it was substantially certain that their acts and omissions described herein would cause injury and damage, including PFOA and PFOS contamination of Ridgewood's wells. Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFAS Products, or to reduce or eliminate expenses Manufacturer Defendants would otherwise have incurred to remove PFOA and/or PFOS from their waste streams, despite the impacts on Ridgewood's wells and on public health and welfare. Therefore, Ridgewood requests an award of punitive damages for Manufacturer Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Ridgewood requests an award of punitive damages in an amount sufficient to punish these Manufacturer Defendants and that fairly reflects the aggravating circumstances alleged herein.

212.    Manufacturer Defendants are strictly, jointly and severally liable for all such damages, and Ridgewood is entitled to recover all such damages and other relief as set forth below.

213.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liabilities relating to this cause of action.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Manufacturer

Defendants, jointly and severally, for

a. Declaratory judgment that Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in Ridgewood's wells as described herein and to compensate Ridgewood for the lost value and benefits its wells during all times of injury caused by Defendants' PFAS Products, and for such orders as may be necessary to provide full relief to address the risks to Ridgewood and its customers;

b. Compensatory damages for all injuries Ridgewood has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Defendants' PFAS Products, and their wrongful marketing and promotion thereof; and for all other injuries sustained by Ridgewood as a direct and proximate result of Defendants' acts and omissions alleged herein, according to proof, including, but not limited to remedial, administrative, oversight, and legal expenses and compensation for damages to Ridgewood's wells;

c. Punitive damages in an amount to be determined at trial;

d. Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

e. Such other relief as this Court deems equitable, just, and appropriate.

**THIRD CAUSE OF ACTION**
**Negligence**
**(Against All Defendants)**

214. Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

215.    As manufacturers of PFAS Products, Manufacturer Defendants owed a duty to Ridgewood to warn buyers and users of their PFAS Products of the hidden dangers associated with release to the environment of PFOA and PFOS in those products.

216.    Manufacturer Defendants breached this duty by inadequately warning users and buyers of their PFAS Products of the likelihood that their products would cause PFOA and PFOS to be released to the environment during their normal, intended and foreseeable use, and of the widespread, toxic, and persistent effects of such releases. To the extent Manufacturer Defendants provided warnings about their products, such warnings did not convey a fair indication of the nature and extent of the hidden dangers of Manufacturer Defendants' products to the mind of a reasonable user, because, among other things, they lacked descriptions of the nature and extent of the contamination of drinking water production wells that resulted from those products. Indeed, despite Manufacturer Defendants own unique knowledge of such hazards, they elected to withhold such knowledge from Ridgewood, regulators, and the public; to affirmatively distort and/or suppress their knowledge and the scientific evidence linking their products to such hazards; and to instruct users to release their products directly to the ground where PFOA and PFOS therein could infiltrate drinking water supplies.

217.    Among other things, Manufacturer Defendants breached this duty when they manufactured, marketed, distributed, supplied, and/or sold PFAS Products even though they knew or should have known of the dangers that PFOA and PFOS posed to drinking water supplies. Manufacturer Defendants should have known that the manner in which they were manufacturing, marketing, and selling PFAS Products would result in and cause contamination of Ridgewood's wells.

218.    Ridgewood's wells were and are within the area foreseeably exposed to the risk of

Manufacturer Defendants' inadequate warnings about their PFAS Products. Manufacturer Defendants knew or should have known of the myriad potential industrial and consumer release sites and of the rapid mobility and persistence of PFOA and PFOS released to the environment, such that all of Ridgewood's wells are susceptible to PFOA and PFOS contamination.

219.    Manufacturer Defendants failed to warn of the hidden dangers associated with their PFAS Products before those products left their control, and at all stages of the chain of commerce; at no time relevant to this Second Amended Complaint did Manufacturer Defendants warn that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

220.    As a direct and proximate result of Manufacturer Defendants' failure to warn of the hazards of their PFAS Products in New Jersey that were, or reasonably should have been, known to them, Ridgewood's wells are contaminated with PFOA and PFOS.

221.    As a direct and proximate result of Manufacturer Defendants' acts and omissions as alleged herein, Ridgewood has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

222.    Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of Ridgewood's wells. Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFAS Products, or to reduce or eliminate expenses Manufacturer Defendants would otherwise have incurred to remove PFOA and PFOS from their waste streams, despite the impacts on Ridgewood's wells and on public health and welfare. Therefore, Ridgewood requests

2:19-cv-02198-RMG　　　Date Filed 06/02/23　　　Entry Number 74　　　Page 55 of 67

an award of punitive damages for Manufacturer Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Ridgewood requests an award of punitive damages in an amount sufficient to punish these Manufacturer Defendants and that fairly reflects the aggravating circumstances alleged herein.

223.　　Manufacturer Defendants are jointly and severally liable for all such damages, and Ridgewood is entitled to recover all such damages and other relief as set forth below.

224.　　Upon information and belief, Corteva and New DuPont assumed Old DuPont's liabilities relating to this cause of action.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Defendants, jointly and severally, for

a.　　Declaratory judgment that Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in Ridgewood's wells as described herein and to compensate Ridgewood for the lost value and benefits its wells during all times of injury caused by Defendants' PFAS Products, and for such orders as may be necessary to provide full relief to address the risks to Ridgewood and its customers;

b.　　Compensatory damages for all injuries Ridgewood has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Defendants' PFAS Products, and their wrongful marketing and promotion thereof; and for all other injuries sustained by Ridgewood as a direct and proximate result of Defendants' acts and omissions alleged herein, according to proof, including, but not limited to

remedial, administrative, oversight, and legal expenses and compensation for damages to Ridgewood's wells;

c.    Punitive damages in an amount to be determined at trial;

d.    Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

e.    Such other relief as this Court deems equitable, just, and appropriate.

**FOURTH CAUSE OF ACTION**
**Trespass**
**(Against All Defendants)**

225.    Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

226.    Ridgewood is entitled to exclusive possession of its drinking water production wells.

227.    The presence of PFAS in Ridgewood's wells constitutes a physical invasion of Ridgewood's property without permission or license.

228.    Manufacturer Defendants are jointly and severally liable for trespass, and continued trespass, because Manufacturer Defendants negligently and recklessly caused PFOA and PFOS to be present in Ridgewood's wells as described herein.

229.    As long as Ridgewood's wells remain contaminated with PFOA and PFOS due to Manufacturer Defendants' conduct, the trespass continues.

230.    Ridgewood is harmed by the presence of Manufacturer Defendants' PFOA and PFOS in its wells, including, but not limited to, by being unable to use contaminated wells; and by incurring expenses in planning for, constructing, operating, and maintaining treatment infrastructure at contaminated wells.

231.   Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of Ridgewood's wells. Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFAS Products, or to reduce or eliminate expenses Manufacturer Defendants would otherwise have incurred to remove PFOA and PFOS from their waste streams, despite the impacts on Ridgewood's wells and on public health and welfare. Therefore, Ridgewood requests an award of punitive damages for Manufacturer Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. Ridgewood requests an award of punitive damages in an amount sufficient to punish these Manufacturer Defendants and that fairly reflects the aggravating circumstances alleged herein.

232.   Manufacturer Defendants are jointly and severally liable for all such damages, and Ridgewood is entitled to recover all such damages and other relief as set forth below.

233.   Upon information and belief, Corteva and New DuPont assumed Old DuPont's liabilities relating to this cause of action.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Defendants, jointly and severally, for

   a.   Declaratory judgment that Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in Ridgewood's wells as described herein and to compensate Ridgewood for the lost value and benefits its wells during all times of injury caused

by Defendants' PFAS Products, and for such orders as may be necessary to provide full relief to address the risks to Ridgewood and its customers;

b.    Compensatory damages for all injuries Ridgewood has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Defendants' PFAS Products, and their wrongful marketing and promotion thereof; and for all other injuries sustained by Ridgewood as a direct and proximate result of Defendants' acts and omissions alleged herein, according to proof, including, but not limited to remedial, administrative, oversight, and legal expenses and compensation for damages to Ridgewood's wells;

c.    Punitive damages in an amount to be determined at trial;

d.    Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

e.    Such other relief as this Court deems equitable, just, and appropriate.

## FIFTH CAUSE OF ACTION
### Actual Fraudulent Transfer in Relation to Chemours Spinoff
### (Against Fraudulent Transfer Defendants)

234.    Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

235.    Ridgewood is and was a creditor of Chemours and Old DuPont at all relevant times.

236.    Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Chemours Separation Agreement (the "Chemours Assumed Liabilities").

237.    The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

238.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

239.    Old DuPont and Chemours made the Chemours Transfers and transferred/assumed the Chemours Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Old DuPont and Chemours.

240.    Ridgewood has been harmed as a result of the Chemours Transfers and the Chemours Assumed Liabilities.

241.    Under Del. Code. tit. 6, §§ 1301 to 1312 and N.J. Stat. Ann. §§ 25:2-20 to 25:2-34, Ridgewood is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

242.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liabilities for actual fraudulent transfer.**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against the Fraudulent Transfer Defendants, jointly and severally, for

a.    An order voiding the Chemours Transfers to the extent necessary to satisfy a judgment in this case;

b.    An injunction enjoining New DuPont and Corteva from distributing, transferring, capitalizing, or otherwise encumbering any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

c.    An order imposing a constructive trust over the proceeds of the Chemours Transfers for the benefit of Ridgewood;

55

      d.      Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

      e.      Such other relief as this Court deems equitable, just, and appropriate.

**SIXTH CAUSE OF ACTION**
**Constructive Fraudulent Transfer in Relation to Chemours Spinoff**
**(Against Fraudulent Transfer Defendants)**

243.    Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

244.    Ridgewood is and was a creditor of Chemours and Old DuPont at all relevant times.

245.    Each of the Chemours Transfers and Chemours's assumption of the Chemours Assumed Liabilities was made to benefit, or for the benefit of, Old DuPont.

246.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Assumed Liabilities.

247.    Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

248.    At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Old DuPont intended Chemours to incur, or believed, or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

249.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

56

250.     At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

251.     Ridgewood has been harmed as a result of the Chemours Transfers and the Chemours Assumed Liabilities.

252.     Under Del. Code. tit. 6, §§ 1301 to 1312 and N.J. Stat. Ann. §§ 25:2-20 to 25:2-34, Ridgewood is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

253.     Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability for constructive fraudulent transfer.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against the Fraudulent Transfer Defendants, jointly and severally, for

a.      An order voiding the Chemours Transfers to the extent necessary to satisfy a judgment in this case;

b.      An injuction enjoining New DuPont and Corteva from distributing, transferring, capitalizing, or otherwise encumbering any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

c.      An order imposing a constructive trust over the proceeds of the Chemours Transfers for the benefit of Ridgewood;

d.      Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

e.      Such other relief as this Court deems equitable, just, and appropriate.

**SEVENTH CAUSE OF ACTION**
**Actual Fraudulent Transfer in Relation to Dow-DuPont Merger and Subsequent**
**Restructurings, Asset Transfers, and Separations**
**(Against Old DuPont, New DuPont, and Corteva)**

254.    Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

255.    Ridgewood is and was a creditor of Old DuPont at all relevant times.

256.    Through its participation in the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

257.    The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

258.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

259.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

260.    Ridgewood has been harmed as a result of the Old DuPont Transfers.

261.    Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as Ridgewood that have been damaged as a result of the actions described in this Second Amended Complaint.

262.    Under Del. Code. tit. 6, §§ 1301 to 1312 and N.J. Stat. Ann. §§ 25:2-20 to 25:2-34, Ridgewood is entitled to void the Old DuPont Transfers and to recover property and value transferred to New DuPont and Corteva.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Old DuPont, New DuPont, and Corteva, jointly and severally, for

a.   An order voiding the Old DuPont Transfers to the extent necessary to satisfy a judgment in this case;

b.   An order enjoining New DuPont and Corteva from distributing, transferring, capitalizing, or otherwise encumbering any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

c.   An order imposing a constructive trust over the proceeds of the Chemours Transfers for the benefit of Ridgewood;

d.   An order imposing a constructive trust over the proceeds of the Old DuPont Transfers for the benefit of Ridgewood;

e.   Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

f.   Such other relief as this Court deems equitable, just, and appropriate.

## EIGHTH CAUSE OF ACTION
### Constructive Fraudulent Transfer in Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers, and Separations
### (Against Old DuPont, New DuPont, and Corteva)

263.   Ridgewood realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

264.   Ridgewood is and was a creditor of Old DuPont at all relevant times.

265.   Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

266.   Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

267.    At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

268.    Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

269.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

270.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

271.    Ridgewood has been harmed as a result of the Old DuPont Transfers.

272.    Under Del. Code. tit. 6, §§ 1301 to 1312 and N.J. Stat. Ann. §§ 25:2-20 to 25:2-34, Ridgewood is entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

**WHEREFORE**, Plaintiff Ridgewood Water prays for judgment against Old DuPont, New DuPont, and Corteva, jointly and severally, for

a.    An order voiding the Old DuPont Transfers to the extent necessary to satisfy a judgment in this case;

b.    An order enjoining New DuPont and Corteva from distributing, transferring, capitalizing, or otherwise encumbering any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

c.    An order imposing a constructive trust over the proceeds of the Chemours Transfers for the benefit of Ridgewood;

d.    An order imposing a constructive trust over the proceeds of the Old DuPont Transfers for the benefit of Ridgewood;

e.    Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and postjudgment interest, to the full extent permitted by law; and

f.    Such other relief as this Court deems equitable, just, and appropriate.

Dated: May 24, 2023                **SHER EDLING LLP**

By:   */s/ Draft*
      _____
      Matthew K. Edling

      VICTOR M. SHER
      vic@sheredling.com
      MATTHEW K. EDLING
      matt@sheredling.com
      KATIE H. JONES
      katie@sheredling.com
      STEPHANIE D. BIEHL
      stephanie@sheredling.com
      **SHER EDLING LLP**
      100 Montgomery St. Suite 1410
      San Francisco, CA 94104
      (628) 231-2500

      MATTHEW S. ROGERS
      msr@mrogerslaw.com
      **LAW OFFICES OF MATTHEW S. ROGERS, L.L.C.**

      *Attorneys for Plaintiff Ridgewood Water*

**VI.     Designation of Trial Counsel**

**PLEASE TAKE NOTICE** that pursuant to the provisions of New Jersey Court Rule 4:25-4, Sher Edling LLP is hereby designated as trial counsel for Ridgewood.

**VII.     Certification Pursuant to Rule 4:5-1**

I, Matthew S. Rogers, of full age, hereby certify as follows:

1.     I am an attorney-at-law for Plaintiff in the above-captioned matter. I am fully aware of the facts herein.

2.     The matter in controversy is neither the subject of any other action pending in any other court nor of a pending arbitration proceeding.

3.     It is not anticipated that the matter in controversy will become the subject of any other action pending in any other court or of a pending arbitration proceeding. Similar subject matter is at issue in the federal multi-district litigation styled *In re Aqueous Film-Forming Foams Products Liability Litigation*, No. MDL 2873 (U.S. Jud. Pan. Mult. Lit. Dec. 7, 2018).

4.     All parties who should have been joined in this action have been so joined.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

Dated: May 24, 2023                              **Law Offices of Matthew S. Rogers, L.L.C.**


By:     */s/ Matthew S. Rogers*
        Matthew S. Rogers

        *Attorneys for Plaintiff Ridgewood Water*

## VIII.  Demand for Jury Trial

Pursuant to New Jersey Court Rules 1:8-1(b) and 4:35-1(a), Plaintiff requests a trial by jury of all issues so triable raised in this Second Amended Complaint.

Dated: May 24, 2023                         **SHER EDLING LLP**


By:   */s/ Matthew K. Edling*
      Matthew K. Edling

      VICTOR M. SHER
      vic@sheredling.com
      MATTHEW K. EDLING
      matt@sheredling.com
      KATIE H. JONES
      katie@sheredling.com
      STEPHANIE D. BIEHL
      stephanie@sheredling.com
      **SHER EDLING LLP**
      100 Montgomery St. Suite 1410
      San Francisco, CA 94104
      (628) 231-2500

      MATTHEW S. ROGERS
      msr@mrogerslaw.com
      **LAW OFFICES OF MATTHEW S. ROGERS, L.L.C.**

      *Attorneys for Plaintiff Ridgewood Water*